## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION


| | | |
|---|---|---|
| **MICHAEL SCHECK,** | : | **Case No. 06-CV-1761** |
| **Petitioner,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| **JULIUS WILSON, WARDEN,** | : | **MEMORANDUM & ORDER** |
| **Respondent.** | : | |


Before the Court is Petitioner Michael Scheck's ("Scheck") *Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus* (Doc. 1, Petition).  Scheck's Petition asserts two grounds for relief: (1) ineffective assistance of appellate counsel and (2) violations of due process related to destruction of evidence by the State. The case was automatically referred to Magistrate Judge David S. Perelman for preparation of a Report and Recommendation ("R&R").  Respondent Warden Julius Wilson ("the State") filed an Answer/Return of Writ (Doc. 6, Answer) and Scheck filed a Reply (Doc. 7, Reply). On May 1, 2007, Magistrate Judge Perelman issued an R&R recommending that this Court deny Scheck's petition in all respects.  (Doc. 8, R&R.)  Scheck timely filed objections to the R&R (Doc. 9, Objections), and the State did not respond to Scheck's objections.  Consequently, this Petition is ripe for adjudication.  For the reasons articulated below, the Court **ADOPTS, in part**, the R&R and **DENIES** Scheck's Petition.[1]

---

[1] Also pending before the Court is the *Motion to Compel Court Order and Request for Emergency Restraining Order by Petitioner Michael Scheck* ("Motion to Compel"). (Doc. 11.) Scheck filed the Motion to Compel on March 13, 2009, the State filed a Response on March 16, 2009 (Doc. 12), and Scheck filed a Reply on March 25, 2009 (Doc. 13).  Consequently, the Motion to Compel is also ripe for resolution.   For the reasons articulated below, Scheck's Motion to Compel is **DENIED**.

I.    **BACKGROUND**

The R&R accurately sets forth the undisputed factual and procedural background of this case. (Doc. 8 at 1-6.)  In the interest of efficiency, therefore, the Court adopts the R&R's articulation of the relevant factual and procedural background, with one notable exception addressed in the course of the summary below.  To the extent necessary the Court will describe factual and/or procedural issues worthy of additional consideration.  The following provides a summary of the pertinent facts.

A.    **PROCEDURAL HISTORY**

On December 10, 2004, the Medina County, Ohio grand jury returned an indictment charging Scheck with one count of rape and one count of kidnapping in violation of Ohio law.  The indictment stemmed from events involving Scheck, A.J. Samhan (Scheck's employee), and T.D. (a nineteen year old female) that took place at Scheck's home on the evening of July 27, 2004 and early morning of July 28, 2004.  On February 11, 2005 a Medina County, Ohio jury found Scheck guilty on all counts.  On March 23, 2005, Scheck was sentenced to five (5) years in prison for each count, to run concurrently.  He timely appealed his conviction and sentence to the Court of Appeals of Ohio, Ninth Appellate District, Medina County.  On February 15, 2006, the Ninth Appellate District affirmed his conviction.  Scheck then appealed to the Ohio Supreme Court, who denied his petition on May 24, 2006.  Approximately two months later, Scheck filed the Petition for a Writ of Habeas Corpus now before this Court.  (Doc. 1.)

B.    **FACTS OF THE UNDERLYING CONVICTION**

The R&R sets forth the facts found by the jury at trial, as stated by the state appellate court. (Doc. 8 at 1-4.)  In sum, the facts are as follows:

On the evening of July 27, 2004, Scheck and his employee, A.J. Samhan, were at Scheck's

residence with T.D., the nineteen year old daughter of one of Scheck's friends, and a long-time friend of Samhan's.  After Scheck and T.D. drank several beers and snorted lines of cocaine in the basement, Scheck forcibly performed nonconsensual oral sex on T.D. and digitally violated her.  Subsequently, all three moved upstairs to the empty bedroom of one of Scheck's children, where Samhan had forcible sexual intercourse with T.D., and Scheck again digitally violated her and performed nonconsensual oral sex on her.  The evidence presented at trial indicated that T.D. told Scheck to "stop," both in the basement and the bedroom, and he did not comply.  The evidence also indicated that T.D. "blacked out" at some point during the evening and does not recall how she ended up in the upstairs bedroom.  She recalls waking up at 4:00 a.m. in the upstairs bedroom with Samhan, at which time she attempted to gather her belongings and left for home.

T.D. went home and stayed in bed the next day, July 28.  She did not go to work and did not tell her fiancee, with whom she lived, about the events of the previous evening.  On July 29 she went to work, where she told a co-worker what had happened.

Later on the morning of July 29, 2004 T.D. went to the Medina County Sheriff's office with her mother and filed a police report.  The police gave her a recording device and told her to record incoming telephone calls from Scheck and Samhan.

She then went to the hospital, where forensic nurses interviewed and examined her.  She told the nurses what happened, including the fact that she could not recall portions of the evening, that she had consumed alcohol and cocaine that evening, and that she was taking the anti-depressant Zoloft.  The nurses obtained a urine sample, but did not test the sample in any way.

On that same day, July 29, 2004, the police executed a search warrant of Scheck's house. Among other things, the police found three condom wrappers and T.D.'s underwear in the upstairs

-3-

bedroom.  The police also interviewed Samhan, who was at the residence at the time of the search.

Samhan told the police that he had consensual sex with T.D., but that Scheck had performed oral sex

on T.D. against her will.

On July 30, 2004, T.D. recorded telephone conversations with both Samhan and Scheck.

During their recorded conversation, Scheck admitted that he "touched" T.D., but denied raping her.

He claimed he had a videotape that would disprove her account of the encounter, and he threatened

to show the videotape to her father.  T.D. maintained that she had not consented to Scheck's conduct

and had told him to stop.  Scheck later admitted that there was no videotape.

Approximately two weeks after the nurses examined T.D. and obtained the urine sample, it

was destroyed.[2]  The evidence presented at trial indicated that the detective and the prosecutor on

the case consulted and determined that, because the sample was taken two days after the night the

events occurred, and because T.D. admitted to consuming cocaine and alcohol that night, it was

unnecessary to test the sample.

### C.    SCHECK'S GROUNDS FOR RELIEF IN HIS PETITION

Scheck asserted two grounds for relief in his § 2254 Petition.  As articulated by Scheck in

his briefing, the first ground for relief includes several sub-parts, while the second ground is a stand-

alone due process claim:

**GROUND FOR RELIEF NO. 1**:  Petitioner was denied the effective assistance of

---

[2]  In his objections (Doc. 9 at 2), Scheck notes that the state appellate court stated that the
urine sample was "discarded a few days later at the direction of Detective Kevin Ross of the
Medina County Sheriff's Office."  (Doc. 8 at 3.)  Scheck disputes the accuracy of this timeframe,
asserting that the testimony at trial indicated that the prosecutor, not Detective Ross directed the
destruction of the sample, and that it was not discarded approximately two weeks after it was
obtained, not "a few days."  The State does not dispute Scheck's assertion, and its briefs assume
the two-week timeframe.  Accordingly, the above articulation of the facts is correct and
undisputed.

counsel when counsel failed to raise his most significant and obvious issues on direct appeal in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

I)      Counsel's failure to raise sentencing issues on appeal;

II)     Appellate counsel's failure to raise trial counsel's failure to investigate;

III)    Appellate counsel's failure to raise trial counsel's failure to object;

       A)      [The prosecutor testified] to facts not in evidence and misrepresenting facts in evidence. There are no issues of untimeliness in this case.

           i)      The complaining witness said no,
           ii)     The complaining witness consistently told the truth,
           iii)    Additional inconsistencies between the complaining witness and the co-defendant,

               a)      Phone calls,
               b)      From the basement to the bedroom.

**GROUND FOR RELIEF NO 2**: Petitioner was denied a fair trial, and due process of law when the state, acting in bad faith, ordered the destruction of potentially exculpatory evidence.

(Doc. 7 at 2.)  Because this chart, provided by Scheck in his Reply, conveniently organizes his claims and sub-claims, the Court will use it to identify claims and sub-claims throughout the remainder of this Memorandum & Order.

## II.    <u>LAW AND STANDARD OF REVIEW</u>

Scheck filed his § 2254 Petition on July 20, 2006.  Therefore, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this Court's review of that petition.  *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998); *see also Woodford v. Garceau*, 538 U.S. 202, 210 (2003).[3]

-------------------------------------------------

[3]  The AEDPA applies to petitions filed *after* the Act's April 26, 1996 effective date. *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999).

## A.    SCHECK'S PETITION IS <u>NOT</u> TIME-BARRED

First, as a procedural matter, the AEDPA requires that *habeas* petitions be filed within one year of the latest of four triggering dates set forth at 28 U.S.C. § 2244(d)(1).  In this case, it is undisputed that Scheck timely filed his Petition pursuant to 28 U.S.C. § 2244(d)(1)(A).[4]

## B.    APPLICABLE PREREQUISITES TO HABEAS RELIEF

In addition to the statute of limitations, there are two other prerequisites to habeas relief under the AEDPA.  First, state prisoners must ordinarily exhaust all available state court remedies prior to seeking habeas relief.  28 U.S.C. § 2254(b), (c); *Rhines v. Weber*, 544 U.S. 269, 274 (2005). Second, under the doctrine of procedural default, a habeas petitioner cannot ordinarily assert claims that were not properly submitted to the state court under its procedural rules and which are now barred by state procedural law.  *See Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

### 1.    Exhaustion

A petitioner has exhausted his state court remedies when he has fairly presented all of the claims raised in his habeas petition to the state courts.  *Rhines*, 544 U.S. at 274.  The petitioner bears the burden of proving exhaustion.  *See Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  The

---

[4]  Section 2244(d)(1)(A) provides:

(d)(1)    A 1-year period of limitation shall apply to an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a state court. The limitation period shall run from the latest of –

(A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review . . .

28 U.S.C. § 2244(d)(1)(A).  The Ohio Supreme Court denied Scheck's petition for appeal on May 24, 2006 and he filed this Petition approximately two months later -- *i.e.*, well within the one-year limitations period.  (*See* Doc. 1.)

exhaustion requirement is satisfied if the petitioner presents the factual and legal basis of all his claims to the highest state court, thus giving the state an opportunity to adjudicate the claims before the petitioner seeks habeas relief in federal court. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). By fairly presenting his claims to the state's high court, the petitioner gives each rung in the state judicial ladder a chance to address the claims and exhausts the state's established procedures. *Id.*

Habeas relief is only appropriate for violations of federal constitutional rights. 28 U.S.C. § 2254(d). Claims asserted as general allegations related to a federal constitutional right do not satisfy the "fairly presented" standard for exhaustion – it is not enough to simply mention "due process," for instance. *See Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006). The Sixth Circuit has described several ways in which a petitioner properly can assert the legal and factual basis of his claim:

> (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.

*Whiting v. Burt*, 395 F.3d 602, 613 (6th Cir. 2005).

When a claim has not been exhausted, the district court generally must dismiss the petition in its entirety, thus giving the petitioner an opportunity to fairly present the unexhausted claim to the appropriate state court. *See Rose v. Lundy*, 455 U.S. 509, 518-20 (1982); *Rockwell v. Yukins*, 217 F.3d 421, 424 (6th Cir. 2000) (holding that the AEDPA preserved the Rose rule that a petition including exhausted and unexhausted claims should be dismissed). As discussed below, however, when a claim is unexhausted, but the petitioner has no remaining avenues to pursue relief in the state

-7-

court, for whatever reason, the district court will analyze the petition under procedural default. *See Buell v. Mitchell*, 274 F.3d 347, 349 (2001).

## 2. Procedural Default

The procedural default doctrine bars federal review of the merits of a habeas ground for relief in two circumstances. First, procedural default bars habeas review of an exhausted claim if the state courts below applied a state procedural rule and declined to address the merits of that ground. *See Wainwright*, 433 U.S. at 87. In other words, when the last explained state court decision rests upon procedural default, a federal district court is not required to reach the merits of a habeas petition's claims. *McBee v. Abramajtys*, 929 F.2d 264, 265 (6th Cir. 1991). Second, procedural default bars habeas review of an unexhausted claim when, hypothetically, a state procedural rule would now bar the unexhausted claim. Accordingly, any claim that the Court determines was procedurally defaulted, or in the case of an unexhausted claim, would now be procedurally defaulted, in the state courts generally will not be reviewable in a federal habeas proceeding.

Two exceptions exist, however. A ground that has been otherwise procedurally defaulted can be rescued if the petitioner demonstrates: 1) adequate cause for the default, and that actual prejudice resulted from the alleged federal law violation; or 2) that failure to consider the claim will result in a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 751 (1991) (emphasis added). As to the first, "cause" is a legitimate excuse for the default, and "prejudice" is actual harm resulting from the alleged constitutional violation. *See Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984), *cert. denied*, 490 U.S. 1068 (1985). To establish "cause," the petitioner must "[d]emonstrat[e] that an 'objective factor external to the defense impeded [the petitioner's] efforts to comply' with the state procedural rule." *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir.

2006) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)), *cert. denied*, 127 S.Ct. 941 (2007). "Prejudice" is established if the petitioner shows that he was actually prejudiced as a result of the claimed constitutional error. *See United States v. Frady*, 456 U.S. 152, 170 (1982).  If a petitioner fails to show sufficient cause for his procedural default, a  reviewing court need not address the prejudice prong. *See Smith v. Murray*, 477 U.S. 527 (1986).

To determine whether a ground has been procedurally defaulted, a federal court must determine whether the state courts below addressed the ground's merits.   To make that determination, federal courts must rely on the presumption that there are no independent and adequate state grounds for a state court decision absent a clear statement to the contrary.  *See Coleman*, 501 U.S. at 735; *see also Harris v. Reed*, 489 U.S. 255, 263 (1989) (holding that the presumption applies unless the last reasoned state court opinion "clearly and expressly states that its judgment rests on a state procedural bar").  Applying this presumption, and considering the "cause and prejudice" exception identified above, the Sixth Circuit established a four-step analysis in *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), to determine whether a ground has been procedurally defaulted.  The Maupin test requires federal courts to determine:

> (1)    whether the petitioner failed to comply with an applicable state procedural rule;
>
> (2)    whether the state courts actually enforced the state procedural sanction;
>
> (3)    whether the state procedural bar is an "adequate and independent" state ground on which the state can foreclose federal review; and
>
> (4)    if the above are met, whether the petitioner has demonstrated "cause" and "prejudice."

*Id.* at 138.

In his R&R, Magistrate Judge Perelman discusses exhaustion and procedural default in

dismissing two of Scheck's claims.

### B.  STANDARD FOR MERITS REVIEW

When the petitioner has satisfied the procedural prerequisites, the AEDPA sets forth the standard by which federal courts review the merits of properly-asserted grounds for relief.  In pertinent part, the AEDPA provides:

(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

After passage of the AEDPA, the various circuits interpreted the standard to be applied differently under these provisions.   In response to these nationwide variations, the Supreme Court directly addressed the meaning of the AEDPA's statutory language and, as the Sixth Circuit has confirmed, announced that the statute "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court."  *Campbell v. Coyle*, 260 F.3d 531, 539 (6th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)) (emphasis added).

The Supreme Court clarified the language of § 2254(d)(1), and held that:

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of

-10-

> materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams*, 529 U.S. at 412-413 (emphasis added). The Court offered additional guidance regarding the meaning of "unreasonable application." A state-court opinion can also engender the 'unreasonable application' of Supreme Court precedent if it "either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context." *Id*. at 409. Further, the Court declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* (emphasis added). Elaborating on the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*

Additionally, in reviewing habeas petitions, federal courts are obliged to "accept as valid a state court's interpretation of state law and rules of practice of that state." *Vroman v. Brigano*, 346 F.3d 598, 604 (6th Cir. 2003); *see also Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986). Similarly, they are not free to ignore the pronouncement of a state appellate court on matters of state law. *See Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672, 676 (6th Cir. 2000). The standard of review applied to the merits of a petition for a writ of habeas corpus, therefore, is a stringent one.

## III.     ANALYSIS OF THE MAGISTRATE JUDGE'S R&R

In his R&R (Doc. 8), Magistrate Judge Perelman recommends denying Scheck's Petition in

-11-

its entirety and dismissing this case.  Specifically, he concludes that Ground 1 fails because Scheck procedurally defaulted claims II and III(A)(iii)(a)-(b), and the rest of Ground 1 and Ground 2 fail on the merits.  Scheck filed Objections to the R&R, raising an objection to the Magistrate Judge's analysis with respect to each claim and sub-claim.  Pursuant to 28 U.S.C. § 636(b)(1), the Court has conducted a *de novo* review of the R&R based on Scheck's objections.  Accordingly, the Court will now address each Ground.  Ultimately, the Court concurs with Magistrate Judge Perelman's recommendation that Scheck's Petition fails to assert a valid claim for *habeas* relief, although, as discussed below, the Court rejects certain aspects of the analysis in the R&R.

### A.      GROUND 1: INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

In Ground 1 of Scheck's Petition, he asserts that his appellate counsel was constitutionally ineffective when he "failed to raise his most significant and obvious issues on direct appeal in violation of the Sixth and Fourteenth Amendments to the United States Constitution."  (*See* Doc. 8 at 5.)  Scheck asserts three claims of ineffective assistance of appellate counsel in Ground 1: (I) failure to raise his *Blakely* claim on appeal; (II) failure to raise trial counsel's failure to investigate; and (III) failure to raise trial counsel's failure to object at trial.  After setting forth the applicable law, the R&R addresses each of these ineffective assistance of appellate counsel claims in turn.

### 1.      The *Strickland* Test for Ineffective Assistance of Counsel

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established the test for ineffective assistance of counsel claims.  "Under *Strickland*, a successful ineffective assistance of counsel claim must demonstrate both the objective unreasonableness of defense counsel's conduct and its prejudicial effect."  *Wilson v. Parker*, 515 F.3d 682, 698 (6th Cir. 2008) (citing *Strickland*, 466 U.S. at 687-88).  In evaluating the first prong – objective unreasonableness – the Court must consider

-12-

the facts of the particular case <u>as they existed at the time of the counsel's conduct</u>.  *Id.* (citing

*Rompilla v. Beard*, 545 U.S. 374, 385 (2005)).  The second prong – prejudice – requires the

Petitioner to demonstrate "that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different.  A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also*

*Williams*, 529 U.S. at 391; *Wilson*, 515 F.3d at 698-99.

Claims of ineffective assistance of *appellate* counsel are governed by the same standard, and

the Court "assess[es] the strength of the claim appellate counsel failed to raise." *Wilson*, 515 F.3d

at 707.  As stated by the Sixth Circuit, "[c]ounsel's failure to raise an issue on appeal could only be

ineffective assistance if there is a reasonable probability that inclusion of the issue would have

changed the result of the appeal." *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004).  A claim

appellate counsel could have, but did not, raise cannot form the basis of an ineffective assistance of

counsel claim unless the claim had a reasonable probability of success at the time it could have been

raised.  *See McFarland*, 356 F.3d at 699-700.  If the Court concludes that there is a reasonable

probability that raising the issue would have changed the result of the appeal, the Court "can then

consider whether the claim's merit was so compelling that appellate counsel's failure to raise it

amounted to ineffective assistance of appellate counsel." *Id*. at 700.  In this regard, the Sixth Circuit

has stated:

> In order to succeed on a claim of ineffective assistance of appellate counsel, a
> petitioner must show errors so serious that counsel was scarcely functioning as
> counsel at all and that those errors undermine the reliability of the defendant's
> convictions.  Strategic choices by counsel, while not necessarily those a federal judge
> in hindsight might make, do not rise to the level of a Sixth Amendment violation.

*McMeans v. Brigano*, 228 F.3d 674, 682 (6th Cir. 2000) *cert. denied*, 532 U.S. 958 (2001) (citations

omitted).  Failure to raise an issue on appeal constitutes ineffective assistance of appellate counsel "[g]enerally only when ignored issues are clearly stronger than those presented . . . ."  *Smith v. Robbins*, 528 U.S. 259, 288 (2000).

### 2.      Analysis of Ground 1 – Ineffective Assistance of Appellate Counsel

#### a.      Ground 1, Claim I: Appellate Counsel's Failure to Raise Scheck's *Blakely* Claim on Appeal

In his first ineffective assistance of appellate counsel claim, Scheck argues that his appellate counsel was ineffective for failing to raise a manifest sentencing error on appeal.  He asserts that the trial court violated the United States Supreme Court's ruling in *Blakely v Washington*, 542 U.S. 296 (2004), as applied to Ohio sentencing law in *State v. Foster*, 109 Ohio St. 3d 1 (2006).  Scheck argues that his appellate counsel should have raised *Blakely* on direct appeal because the trial court relied on facts not determined by the jury, or admitted by Scheck, in enhancing his sentence beyond the statutory minimum.

#### i.      *Blakely* & *Foster*

The State concedes that the sentence imposed by the trial court violates *Blakely*.  (Doc. 6 at 19, 21-22.)  The State's contention, and the R&R's recommendation, is that the *Blakely* violation does not result in a Sixth Amendment violation under *Strickland*.  Accordingly, a basic understanding of the *Blakely* line of sentencing cases is necessary to fully understand how this violation relates to Scheck's first ineffective assistance of appellate counsel claim.

In *Blakely*'s predecessor case, *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the Supreme Court held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory minimum must be submitted to a jury, and proved

-14-

beyond a reasonable doubt." *Apprendi* clearly prohibited any sentence above the statutory maximum based on judicial fact-finding, but it did not define "statutory maximum," and, thus, left open the question of whether it was appropriate to use judicial fact-finding to enhance a sentence within the statutory range. *Blakely* answered this question, defining "statutory maximum" as the highest sentence a judge may impose "solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303. Consequently, after *Blakely*, enhancements within the statutory range which are necessarily based on judicial fact-finding are unconstitutional.

After *Blakely*, the state courts had to determine whether their sentencing schemes, or, rather, particular provisions thereof, violated *Blakely*. The Ohio Supreme Court addressed this question in *State v. Foster*, 845 N.E.2d 470 (Ohio 2006). In *Foster*, the Ohio Supreme Court held that certain provisions of the Ohio sentencing guidelines were unconstitutional in view of *Blakely*. *Foster*, 845 N.E.2d at 477. Accordingly, pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Ohio Supreme Court severed the offending provisions from the Ohio sentencing guidelines. *Id*.

Scheck was sentenced on March 31, 2005, <u>after</u> *Blakely* and pursuant to one of the provisions later excised from the Ohio sentencing guidelines in the *Foster* opinion. His direct appeal concluded on May 24, 2006 when the Ohio Supreme Court denied his petition to appeal. Consequently, because *Foster* was issued on February 27, 2006 and applies retroactively to all cases pending on direct review at the time it was decided, the State concedes that *Blakely* applies to Scheck's sentence. *See Foster*, 845 N.E.2d at 499.

### ii.    Scheck's Argument in his Petition

Accordingly, Scheck argues that his appellate counsel was constitutionally ineffective for failing to raise his *Blakely* claim on appeal in light of *Foster*. Under Ohio law, he was subject to a

-15-

sentence of 3-10 years for each of his first degree felony convictions.  *See* O.R.C. § 2929.14(A)(1).

The Ohio sentencing code in effect at the time required the trial court to make specific findings of

fact in order to impose a sentence above the statutory minimum, in this case, three years on each of

Scheck's felony convictions.  *See* O.R.C. § 2929.14(B).  The trial court made the required findings,

stating as follows:

> The Court finds that pursuant to Revised Code section 2929.14(B) that the shortest
> prison term will demean the seriousness of the defendant's conduct; and the shortest
> prison term will not adequately protect the public from future crime by the defendant
> or others.

(*See* Doc. 8 at 14.)   The Ohio Supreme Court in *Foster*, however, found § 2929.14(B)

unconstitutional pursuant to *Blakely*, and severed it from the sentencing code pursuant to *Booker*.

Therefore, since *Foster*:  (1) was pending at the time the Ohio court of appeals denied his appeal;

(2) was decided less than two weeks later; and (3) applies retroactively to his sentence, Scheck

argues that he would have prevailed on this issue on appeal had his appellate counsel raised it.[5]

### iii.    The R&R's Recommendation: Dismiss

In his R&R, Magistrate Judge Perelman rejects Scheck's *Blakely* claim, concluding that "any

―――――――――――――

[5]  Scheck acknowledges that the *Foster* decision had not issued at the time the Ohio
Appellate Court denied his direct appeal on February 15, 2006.  (*See* Doc. 1-2 at 8-9.)  On this
point, he argues:

> Given the strong language in *Foster*, regarding the retroactive application of the
> decision to cases pending on direct appeal, and the fact that petitioner's direct
> appeal was pending at the same time the *Foster* case was pending in the Ohio
> Supreme Court, it is reasonable to infer that had appellate counsel raised the
> obvious sentencing errors on direct appeal, the ruling in *Foster* would have
> mandated reversal for resentencing.

(*Id*.)

-16-

error in not raising this sentencing issue on appeal did not rise to the level of ineffective assistance of appellate counsel . . . ." (Doc. 8 at 17.)  Magistrate Judge Perelman first confirmed that Scheck's sentence was unconstitutionally enhanced based on judicial fact-finding.  (*Id*. at 15.)  He reasoned, however, that such an error was harmless because Scheck's *Blakely* claim could only result in re-sentencing and, after *Foster*, the trial court could re-sentence Scheck to the same or a higher sentence without resorting to judicial fact-finding.  (*Id*. at 15-17 (citing unreported cases holding that pre-*Foster* violations of *Blakely* constituted harmless error).)  In light of this harmless error analysis, Magistrate Judge Perelman concluded that Scheck's *Blakely* claim did not satisfy the standard for an ineffective assistance of appellate counsel claim because it was "not clearly stronger than the issues presented on appeal, particularly since the issues raised by petitioner's counsel challenged the validity of petitioner's conviction at trial, which could have resulted in the reversal of that conviction, whereas a sentencing challenge, even if it had been successful, could have only resulted in a remand for re-sentencing."  (*Id*. at 16-17.)

### iv.    Scheck's Objections to the R&R

Scheck objects to the R&R's conclusion with respect to his ineffective assistance of appellate counsel claim under *Blakely*, arguing that there is at least a "reasonable probability" that the outcome of his appeal would have been different if appellate counsel had presented his *Blakely* claim because, in light of *Foster*, he would have been entitled to re-sentencing, a patently "different" outcome. (Doc. 9 at 7-8.)  In response to the observation that he could have been re-sentenced to a longer prison term, Scheck notes that he was a first-time offender with "a statutory right to the minimum sentence of 3 years under Ohio law."  (*Id*. at 8.)  Putting aside the question of whether he had a "statutory right" to a three year sentence after *Foster*, Scheck seems to be advancing the argument

-17-

that re-sentencing would likely result in a more favorable sentence.  He requests *de novo* review.[6]

> **v.     Analysis of Scheck's Ineffective Assistance of Appellate Counsel Claim under *Blakely***

The Court agrees with Magistrate Judge Perelman's conclusion, but rejects certain aspects of the analysis in the R&R.  As noted above, it is undisputed that *Blakely* applies to Scheck's sentence through *Foster*, and that the sentence violates *Blakely* because the trial court enhanced Scheck's sentence based upon facts neither admitted by him nor determined by a jury.  The first issue, therefore, implicates the procedural posture of *habeas* review – *i.e.*, whether Scheck's *Blakely* claim has merit as presented to this Court in Scheck's § 2254 Petition as an ineffective assistance of appellate counsel claim.

Scheck did not challenge his sentence directly on appeal.  Instead, he has presented his *Blakely* claim as an ineffective assistance of appellate counsel claim, first raised in his petition to the Ohio Supreme Court filed on March 13, 2006.[7]  (Doc. 6-22 at 7-10, Memo. in Support of

---

[6]  Scheck specifically cites *Cunningham v. California*, 549 U.S. 270 (2007) in support of his request for *de novo* review.  He does not explain the importance of *Cunningham*, and, aside from the fact that it is a recent Supreme Court case discussing and applying the *Blakely* line of cases, the Court perceives no particular relevance to this case.

[7]  This procedural posture distinguishes this case from a prior case before this Court, *Cvijetinovic v. Eberlin*, No. 04-CV-2555, 2008 WL 918576 (N.D. Ohio Mar. 31, 2008).  In *Cvijetinovic*, the § 2254 petitioner, Cvijetinovic, was convicted and sentenced prior to the Supreme Court's decision in *Blakely*.  *Id*. at *1.  He presented a *Blakely* claim as a direct challenge to his sentence, thus requiring the Court to conduct an extensive procedural default analysis turning on whether Cvijetinovic forfeited his *Blakely* claim by failing to anticipate the *Blakely* decision in light of *Apprendi*.  *Id*. at *7-*20.  The Court held that Cvijetinovic established cause and prejudice to overcome procedural default of his *Blakely* claim – *i.e.*, at the relevant time (*i.e.*, prior to *Blakely*), the factual and legal basis of his claim was not reasonably available to his defense counsel and the possibility of obtaining a lower sentence upon re-sentencing prejudiced him.  *Id*. at *20.  Accordingly, the Court granted his petition with respect to his *Blakely* claim.  *Id*. at *23.  Scheck, on the other hand, asserted his claim <u>after</u> *Blakely*, and has no

Jurisdiction.)  As discussed above, an ineffective assistance of counsel claim cannot succeed unless it would have had a reasonable probability of success at the time the petitioner asserts it should have been raised.  *See McFarland*, 356 F.3d at 699-700.

Notably, Scheck asserts that his appellate counsel should have raised this claim in 2005, before the Ohio Supreme Court invalidated O.R.C. § 2929.14(B) in *Foster*.  In fact, at that time, eleven out of the twelve Ohio Appellate Districts had considered and <u>rejected</u> the argument that Ohio's sentencing scheme ran afoul of *Blakely*.  *See State v. Atkins-Boozer*, No. 84151, 2005 WL 1274215, at *6 (Ohio App. Ct. 8 May 31, 2005) (*en banc*)  (citing decisions in all of the twelve Ohio Appellate Districts except the First holding that *Blakely* did not apply to Ohio's sentencing scheme).  In fact, the Ninth Appellate District, the Court in which Scheck's appeal was pending, had specifically held that *Blakely* did not apply to Ohio's sentencing scheme <u>before</u> Scheck was sentenced, *State v. Jenkins*, No. 22008, 2005 WL 19439, at *6 (Ohio App. Ct. 9 Jan. 5, 2005) (holding that *Blakely* does not apply to Ohio's sentencing scheme while considering O.R.C. § 2929.14(B)).  In addition, just two months prior to issuing its opinion in Scheck's case, the Ninth Appellate District rejected a *Blakely* claim very similar to Scheck's potential claim in upholding a five-year sentence for kidnapping, *i.e.*, a sentence within the 3-10 year range for first degree felonies but above the statutory minimum based on judicial fact-finding.  *State v. Pace*, No. 05CA0054-M, 2005 WL 3416182, *1-*2 (Ohio App. Ct. 9 Dec. 14, 2005).

In light of this clear authority, Scheck's *Blakely* claim did not have a reasonable probability of success at the time Scheck asserts his appellate counsel should have raised it.  Although these

---

basis to argue cause and prejudice to overcome procedural default of a direct challenge to his sentence.  Therefore, his claim arises within the rubric of ineffective assistance of appellate counsel.

Ohio Appellate Court cases were obviously overruled by the Ohio Supreme Court's *Foster* decision

on February 27, 2006, Scheck's appellate counsel was operating based on the state of Ohio law prior

to *Foster*.  At that time, the Ohio courts, and, in particular, the Court in which he was litigating the

case, had consistently and expressly rejected the claim Scheck contends his appellate counsel should

have advanced.  Thus, Scheck's appellate counsel was not objectively unreasonable in choosing to

forego that claim.  Accordingly, Scheck's ineffective assistance of appellate counsel claim invoking

*Blakely* fails.  The Court **ADOPTS** the R&R's conclusion with respect to this claim, and, **in part**,

the R&R's analysis.[8]  Ground 1, Claim I is **DISMISSED** accordingly.

> **b.**  **Ground 1, Claim II: Appellate Counsel's Failure to Raise Trial Counsel's Failure to Investigate**

Scheck's second ineffective assistance of appellate counsel claim alleges that appellate

counsel was constitutionally ineffective because he did not assert a claim on appeal based on trial

counsel's failure to investigate the urine sample obtained from T.D. during the forensic exam

---

[8]  As alluded to above, the Court's analysis of Scheck's *Blakely* claim differs from the treatment in the R&R in one notable respect: it is not premised upon the finding that a *Blakely* violation is harmless error under *Washington v. Recuenco*, 548 U.S. 212 (2006) after *Foster*. (*See* Doc. 8 at 15-16.)  In *Cvijetinovic*, 2008 WL 918576 at *20-*23, this Court rejected the very harmless error analysis set forth in Magistrate Judge Perelman's R&R.  In that case, the Court noted as follows:

> "[T]he flaw in [the R&R's harmless error reasoning] is that it equates a possibility of no actual prejudice with an actuality of no prejudice resulting from a constitutional error . . . . [B]ecause more than one outcome is possible upon re-sentencing, basing harmlessness on assumed certainty is flawed.  It converts the concept of harmless error in this context into a doctrine of always harmless error."

*Id*. (quoting *Villagarcia v. Warden*, No. 05-CV-810, 2007 WL 1028528, at *4 (S.D. Ohio Mar. 30, 2007) (Frost, J.)).  The Court remains convinced that its conclusion in *Cvijetinovic* with respect to this issue is correct, and, accordingly, cannot adopt the harmless error analysis in the R&R in this case.

performed two days after the offenses against her.  Scheck argues that defense counsel employed a

toxicology expert to testify with respect to the effect of the various substances T.D. consumed on the

night in question because (1) she had admitted that she consumed alcohol, cocaine and was taking

Zoloft, and (2) a key component of her story was that she "blacked out" and could not recall portions

of the night.  He contends that a reasonable attorney pursuing this defense strategy would have taken

all necessary steps to preserve and investigate any tangible evidence relevant to T.D.'s legal and

illegal drug use on that night.  Specifically, he alleges that trial counsel did not do anything to

"ensure that any rape kit results, or toxicology reports from a collected urine sample were preserved

and available for review."  (Doc. 1 at 4.)  In essence, Scheck blames trial counsel, at least in part, for

allowing the urine sample to be destroyed by the State without having been tested.

###### i.    The R&R's Recommendation: Dismiss as Procedurally Defaulted

Magistrate Judge Perelman concludes that Scheck procedurally defaulted this claim because

the argument he is presenting in his *habeas* Petition is not the same as the argument he presented to

the Ohio Supreme Court.  Specifically, the R&R's entire analysis of this issue states:

> [The State] asserts that Ground One, sub-claim II, in which petitioner argues that his
> appeal counsel was constitutionally ineffective for failing to claim that trial counsel
> was ineffective for failing to take measures to ensure that test results of a urine
> sample were valid prior to the destruction of that sample, is a different theory than
> that presented to the state supreme court, which was that his appeal counsel was
> constitutionally ineffective for [not] claiming that trial counsel was constitutionally
> ineffective for failing to investigate whether the victim was under the influence of
> substances other than alcohol or cocaine at the time of the offenses committed
> against her.
>
> Petitioner having failed to present the same legal theory to the state courts as is
> presented in this sub-claim it has not been preserved for purposes of review in habeas
> corpus.  There has been no showing of evidence of cause for such default or prejudice

arising therefrom.  As a consequence, Ground One, sub-claim II should be dismissed, and not be considered in these proceedings.

(Doc. 8 at 8.)

### ii.    Scheck's Objection to the R&R's Analysis of Ground 1, Claim II

In his objections, Scheck argues that Ground 1, Claim II is the same argument he presented to the Ohio Supreme Court.  (Doc. 9 at 4.)  As he explains it, "[t]he argument presented to the State Supreme Court, and now to this Court is simply that Trial Counsel failed to conduct a proper pre-trial investigation, and Appellate Counsel failed to raise that issue on direct appeal."  (*Id.*)

### iii.    Analysis of Scheck's Ineffective Assistance of Appellate Counsel Claim Relating to Pre-Trial Investigation

The Court rejects this portion of the R&R.  Although there may be some minor semantic differences between Scheck's articulation of this claim as presented to the Ohio Supreme Court and in his *habeas* Petition, the Court cannot conclude that Scheck, a *pro se* litigant, failed to raise this claim before both Courts.  The pleadings of a *pro se* litigant are held to a less stringent standard than those prepared by a lawyer.  *See Martin v. Overton*, 391 F.3d 710, 712 (6th Cir. 2004) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)); *Caver v. Straub*, 349 F.3d 340, 347 (6th Cir. 2003) (noting less stringent standards applicable to *pro se* filings in rejecting procedural default of ineffective assistance claim).  As he accurately noted in his objections, Scheck argued in both fora that appellate counsel should have raised trial counsel's failure to undertake a timely and effective pre-trial investigation related to the substances that may have effected T.D.'s state of mind at the relevant time.  Accordingly, Scheck fairly presented this claim to the Ohio courts and the Court will review it on the merits.

-22-

To prevail on the merits, Scheck must satisfy the *Strickland* test for ineffective assistance of appellate counsel.  *See Strickland*, 466 U.S. at 687-88.  Here, he must establish a reasonable probability that the outcome of the appeal would have been different had appellate counsel raised the issue of trial counsel's failure to conduct a proper pre-trial investigation.  This Scheck cannot do.  Even if trial counsel had propounded a discovery request that ultimately resulted in testing of the urine sample, Scheck's own toxicology expert testified at trial that the urine sample would not have revealed the <u>amount</u> of legal and illegal drugs T.D. had consumed two days earlier.  In other words, the dose makes the poison,[9] and Scheck's own expert informed the jury that the urine sample would not reveal anything with respect to dosage.  Scheck's toxicology expert further testified that, although a person who ingested a combination of alcohol, cocaine, and Zoloft would be unlikely to blackout,  different people react differently to drugs.  Accordingly, trial counsel's failure to investigate did not affect the outcome of the trial, and, thus, the outcome of the appeal would not have changed had appellate counsel raised the issue.

For the foregoing reasons, the Court **REJECTS** the R&R's analysis and conclusion with respect to Ground 1, Claim II, but nonetheless **DISMISSES** the claim.

> **c.** **Ground 1, Claim III: Appellate Counsel Failed to Raise Trial Counsel's Failure to Object to Prosecutorial Misconduct Regarding Misrepresentations of Fact and Vouching for Witness Credibility**

In his third and final ineffective assistance of appellate counsel claim, Scheck argues that

---

[9] This adage is regarded as a central tenant of toxicology.  *See* Reference Manual on Scientific Evidence 2d Ed. 403 (Federal Judicial Center 2000).  It is generally attributed to 15th Century Swiss physician Paracelsus.  *See* Wikipedia, *Paracelsus*, available at http://en.wikipedia.org/wiki/ (last visited June 30, 2009).

appellate counsel failed to raise trial counsel's failure to object to the prosecutor's misrepresentations of fact and "testimony" during the closing argument.  This claim is further sub-divided into specific objections which Scheck contends trial counsel should have interposed. The first and second sub-claim assert that appellate counsel was ineffective because he did not raise trial counsel's failure to object to two statements made by the prosecutor during his closing argument.  First, Scheck contends that trial counsel should have objected when the prosecutor stated that T.D. said "no," *i.e.*, that she did not consent to sexual activity with Scheck.  Second, he contends that trial counsel should have objected when the prosecutor "testified" that T.D. "consistently told the truth," *i.e.*, when the prosecutor "vouched" for T.D.'s credibility.  The third sub-claim asserts that trial counsel was ineffective because he did not object when the prosecutor "testified" to "acts not in evidence and misrepresent[ed] facts in evidence" related to T.D.'s telephone calls and movement from the basement to the bedroom on the night in question.

The State and the R&R treat each of these sub-claims as an independent ground for relief, and, accordingly, analyze each separately.  In his Objections, however, Scheck clarifies that he intended to assert a single claim arguing that appellate counsel was ineffective for failing to object to the prosecutor's improper efforts to bolster the credibility of the key witnesses against Scheck, T.D. and Samhan.  The crux of Scheck's argument is that appellate counsel failed to assert that trial counsel should have raised a general objection on the basis of prosecutor misconduct and sought a curative instruction to the effect that the jury must disregard any statements vouching for the credibility of witnesses or misrepresenting facts.

Although Scheck's Petition does *appear* to advance independent claims regarding appellate counsel's failure to raise specific objections trial counsel neglected to assert, Scheck's objection

-24-

indicates that he intended to assert a single claim, and his *pro se* Petition can be fairly interpreted to do so.  Accordingly, the Court will analyze Ground 1, Claim III as a single claim alleging ineffective assistance of appellate counsel for failure to raise trial counsel's failure to object to prosecutorial misconduct.[10]

### i.    The Applicable Standard for Prosecutorial Misconduct

Scheck's Ground 1, Claim III ineffective assistance of counsel claim depends on the Court finding that prosecutorial misconduct occurred, such that trial counsel's failure to object was a mistake or bad judgment.  If prosecutorial misconduct occurred, then the Court will apply the overlay of the *Strickland* test (although there is substantial overlap in the analysis).  Accordingly, the point of departure for the analysis of this claim is the standard for prosecutorial misconduct on *habeas* review of an ineffective assistance of appellate counsel claim.

The Sixth Circuit has "held that a failure to object to prosecutorial misconduct can amount

---

[10]  If the Court were to read Scheck's Petition to assert independent claims within Ground 1, Claim III, it would adopt the analysis and conclusions in the R&R.  Briefly, with respect to Ground 1, Claim III, Sub-Claim (A)(i), the R&R correctly concludes that it was not improper for the prosecutor to state that T.D. said "no" to sexual activity with Scheck because:  (1) T.D. testified at trial that she said "no," *i.e.*, refused to engage in sexual activity with Scheck; (2) an attorney is permitted to summarize the testimony adduced during the trial in his closing argument; and (3) consequently, there was no basis for an objection.  (Doc. 8 at 17 (citing *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (regarding prosecutor's discretion to draw inferences from the evidence).)  With respect to Ground 1, Claim III, Sub-Claim (A)(ii), the Court's analysis of the general claim herein applies equally to this Sub-Claim.  With respect to Ground 1, Claim III, Sub-Claim (A)(iii), the Court concurs with Magistrate Judge Perelman that, as an independent claim, this claim is procedurally defaulted because Scheck did not mention a neglected objection related to telephone calls or movement from the basement to the bedroom in his petition to the Ohio Supreme Court.  (Doc. 8 at 9.)  Scheck, moreover, admits in his Objections that he did not present these specific arguments to the Ohio Supreme Court.  (Doc. 9 at 6.)  In fact, his discussion of this issue in his Objections is part of his argument that Ground 1, Claim III challenges trial counsel's failure to object to prosecutorial misconduct generally.  (*Id.*)

to ineffective assistance of counsel."  *Hodge v. Hurley*, 426 F.3d 368, 377 (6th Cir. 2005) (citing

*Gravely v. Mills*, 87 F.3d 779, 785-86 (6th Cir. 1996); *Rachel v. Bordenkircher*, 590 F.2d 200, 204

(6th Cir. 1978)).[11]  In general, "[p]rosecutors can argue the record, highlight any inconsistencies or

inadequacies of the defense, and forcefully assert reasonable inferences from the evidence.  But, they

cannot offer their opinions as to credibility of a witness or the guilt of a defendant. . . . Further, they

cannot discuss any purported facts not introduced into evidence."  *Cristini v. McKee*, 526 F.3d 888,

902 (6th Cir. 2008) (omitting citations).  It is well-established that prosecutorial misconduct involving

vouching for the credibility of the witness or misrepresenting facts threaten the integrity of a criminal

trial for two primary reasons:

> The prosecutor's vouching for the credibility of witnesses and expressing his personal
> opinion concerning the guilt of the accused pose two dangers: such comments can
> convey the impression that evidence not presented to the jury, but known to the
> prosecutor, supports the charges against the defendant and can thus jeopardize the
> defendant's right to be tried solely on the basis of the evidence presented to the jury;
> and the prosecutor's opinion carries with it the imprimatur of the Government and
> may induce the jury to trust the Government's judgment rather than its own view of
> the evidence.

*United States v. Young*, 470 U.S. 1, 18-19 (1985) (citing *Berger v. United States*, 295 F.3d 78, 88-89

(1935)).

In his R&R, Magistrate Judge Perelman sets forth the Sixth Circuit's two-part test for

prosecutorial misconduct claims arising on *habeas* review.[12]  First, the Court must determine whether

---

[11]  The Sixth Circuit in *Hodge* went on to note that prosecutorial misconduct poses
"particular dangers" in sexual abuse cases because the outcome frequently turns on witness
credibility.  426 F.3d at 377 n.19 (quoting *Martin v. Parker*, 11 F.3d 613, 616-17 (6th Cir. 1993)).

[12]  Neither party objected to this articulation of the standard, and it comports with the
current law in the Sixth Circuit.  *See, e.g.*, *Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008);
*Girtz v. Yanai*, 501 F.3d 743, 759 (6th Cir. 2007).

the prosecutor's conduct and remarks were "improper."  (Doc. 8 at 19.)  Second, "[i]f the remarks of the prosecutor have been found to be improper, then [the] Court must apply the four-factor test set forth in *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir 1994) to determine 'whether the impropriety was flagrant,' which in turn amounts to deprivation of constitutional rights." *United States v. Carter*, 236 F.3d 777,783 (6th Cir. 2001).  The four factors are:

> (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong.

*Id*.  Further, the prosecutor's remarks must be viewed "within the context of the entire trial" to determine whether they pose the dangers the Supreme Court identified and truly rise to the level of flagrant impropriety.  (Doc. 8 at 11-12); *see also*, *e.g.*, *Carter*, 236 F.3d at 783 (citing *Young*).

### ii.     The R&R Recommendation: Deny on the Merits

Applying this standard, Magistrate Judge Perelman concluded that the prosecutor's comments ostensibly vouching for T.D's credibility were isolated and advanced in the context of refuting the defense theory that T.D. had fabricated the rape allegation in an effort to preserve her relationship with her fiancee.  He also noted that Samhan's eyewitness testimony corroborated T.D.'s account of events.  Accordingly, Magistrate Judge Perelman concluded that Scheck's ineffective assistance of appellate counsel claim fails because he cannot establish a reasonable probability of success on this issue had it been raised on appeal.

### iii.     Scheck's Objection

Sheck objects to the R&R, arguing that Ground 1, Claim III presents several interrelated instances of misconduct by the prosecutor, not just an isolated incident of vouching for T.D.'s

credibility in his closing argument.  He argues that the prosecutor's improper conduct consisted of (1) telling the jury that T.D. did not consent to sexual activity with Scheck; (2) telling the jury that T.D. "consistently told the truth," *i.e.*, vouching for her credibility; and (3) telling the jury that T.D.'s testimony was consistent with Samhan's when there were discrepancies between their testimony with respect to, *e.g.*, when T.D. received phone calls on the night in question and the timing and circumstances of the trio's movement from the basement to the bedroom.  Scheck contends that, in the aggregate, these actions satisfy the standard for prosecutorial misconduct because of the fundamental importance of T.D.'s and Samhan's credibility in this case, and the fact that impeaching their credibility was central to the defense strategy.

### iv.    Analysis

Under the first prong of the prosecutorial misconduct analysis, the Court must determine whether the prosecutor's actions and/or remarks, viewed in the context of the entire trial, were improper.  *Johnson*, 525 F.3d at 482.

Even assuming Scheck's claim is that the prosecutor's actions/remarks constitute misconduct *in the aggregate*, it is self-evident that comments or actions which themselves do not constitute or suggest misconduct cannot be aggregated.  This principle applies to Scheck's assertion that the prosecutor's statement in his closing argument that T.D. said "no" (*i.e.*, did not consent to sexual activity with Scheck), was improper.  In fact, she testified that she told Scheck to "stop," and Samhan testified that "she said 'no'".  (*See* Doc. 6-8, Trial Tr. 73-77; Doc. 6-12, Trial Tr. 276.) Although Scheck questions the *veracity* of the witnesses' testimony on this point, in his closing argument the prosecutor was simply summarizing the testimony adduced at trial, as he is indisputably permitted to do.  *See Cristini*, 526 F.3d at 902.

Similarly, Scheck's argument that the prosecutor misrepresented testimony in stating that T.D. and Samhan testified consistently is meritless and should not be aggregated. Scheck contends that T.D.'s testimony was not entirely consistent with Shaman's, and, therefore, the statement that she "consistently told the truth" could not be true, or, at least, is misleading, because it ignores certain inconsistencies between her testimony and Shaman's testimony. As examples of inconsistencies, he contends that there were discrepancies between T.D.'s and Samhan's testimony regarding phone calls and movement from the basement to the bedroom. Upon review of all of the portions of the record cited by Scheck in connection with phone calls and the trio's movement from the basement to the bedroom, the Court does not find any inconsistencies in T.D. and Samhan's testimony.[13] Therefore, the prosecutor's statement that T.D. and Samhan testified consistently was

---

[13] Specifically, with respect to Scheck's allegation that T.D. and Samhan testified inconsistently regarding phone calls, the portions of the trial transcript Scheck cites do not support his assertion. (*See* Doc. 1-2 at 19-20 (citing Trial Tr. at 77, 126-27, and 304).) Instead, these portions of T.D.'s and Samhan's testimony indicate that they were testifying about *different* phone calls. T.D. testified that she received phone calls at two different times on the night in question. She testified that she received a call from her friend at 8:43 p.m., and she confirmed, based on phone records that she checked her voicemail at approximately 10:00 or 10:30 p.m. (Doc. 6-9, Trial Tr. at 126-27.) She further testified that she could not remember checking her voicemail because she "blacked out" and does not recall the time between the rape and waking up upstairs at 4:00 a.m. (Doc. 6-8, Trial Tr. at 77; Doc. 6-9, Trial Tr. at 126-27.) She *speculated*, however, that she checked her voicemail *before* the rape based on her recollection of the timeline of events prior to the rape. Samhan testifed that *he* received phone calls on the night in question, and that those calls occurred *after* the rape. (Doc. 6-12, Trial Tr. at 304.) Scheck interprets this testimony as inconsistent because T.D. said that phone calls occurred before the rape while Samhan said he received phone calls after the rape. This argument ignores the fact that each witness testified to calls he or she personally received, however. Although Samhan testified that T.D. received phone calls *after* the rape in portions of his testimony Scheck *did not* cite, (Doc. 6-12, Trial Tr. at 277), this does not create an inconsistency with T.D.'s testimony that she did not recall the phone calls, but could speculate that they probably occurred prior to the rape. Scheck also *appears* to interpret T.D.'s testimony that she "blacked out" as an indication that she was unconscious and literally could not have checked her voicemail after she "blacked out." This is not a fair interpretation of the meaning of "blacked out" in context. Review of the testimony indicates that T.D. used the term "blacked out" to refer to a period of time during which she cannot recall her actions, not a period of time in which she was literally unconscious

not a misrepresentation or misleading.    Indeed, the prosecutor's statement falls within the permissible scope of closing argument, which includes the opportunity "to forcefully assert reasonable inferences from the evidence."  *See Cristini*, 526 F.3d at 902.  Accordingly, Scheck's arguments regarding phone calls and movement from the basement to upstairs fail to indicate that the prosecutor's conduct was improper.

Scheck's remaining argument in Ground 1, Claim III is that the prosecutor's statement that T.D. "consistently told the truth" to law enforcement and in her testimony amounted to prosecutorial misconduct because he vouched for T.D.'s credibility.  Specifically, in his closing argument, the prosecutor stated:

> She could have made it a lot worse and she could have said that other things happened, but the reasons she didn't do that is because she told the truth, she consistently told the truth.
>
> And I refuse to stand here and call it a "story," because a story gives the implication that it is not true.

(*See* Doc. 8 at 18 (quoting Trial Transcript).)

In context, these statements were not uttered simply to vouch for the State's witnesses' credibility.  Instead, they were responsive to the defense's attack on T.D.'s and Samhan's credibility. Indeed, the prosecutor specifically couched statements about credibility as logical refutations of the defense theory that T.D. lied to conceal her actions from her fiancee.  (Doc. 6-14 at 7-16.)  The

---

and could not act.  This analysis also applies to Scheck's argument that T.D. and Samhan testified inconsistently with respect to movement from the basement to the bedroom.  T.D.'s testimony was simply that she could not recall how that movement occurred, while Samhan testified to a specific sequence of actions.  There is nothing inconsistent about their testimony.

prosecutor concluded his initial closing statement, moreover, by reminding the jury that it was their

duty to determine credibility:

> To his credit, [Defense Counsel] came right out and said, "[T.D.]'s lying."  He came
> right out and told you.
>
> Well, I'm coming out and telling you, he's lying.  And you can't – it can't be both
> ways.  You have to make that decision.  Somebody's lying here, folks.  Somebody's
> lying; that much we know.
>
> What can you trust?  You can't – what you can't do is throw up your hands and go,
> "I don't know what happened.  Not guilty."  That's not the way the jury system
> works.  You have to determine who is telling the truth and who's lying to you.  And
> you have to weigh all the facts and all the circumstances surrounding what they told
> you, all of the witnesses, all of them, and you decide who's telling you the truth . .
> . .

(Doc. 6-14 at 15-16.)  As such, the statements Scheck challenges do not clearly implicate the first

danger associated with vouching; nothing about the prosecutor's statements, properly contextualized,

conveys the impression that the prosecutor has information not presented to the jury.

On the other hand, the prosecutor did say that T.D. "consistently told the truth."  This

language expressly states that T.D. was credible.  It carries the "imprimatur" of the Government and,

therefore, implicates the second danger associated with vouching, *i.e.*, representations which could

"induce the jury to trust the Government's judgment rather than its own view of the evidence."

*Young*, 470 U.S. at 18-19.  Accordingly, the Court finds that the prosecutor's express representation

that T.D. told the truth was improper vouching and satisfies the first prong of the Sixth Circuit's two-

prong test for prosecutorial misconduct.  *See Carter*, 236 F.3d at 783.

Scheck has not satisfied the second prong of the test, however.  The second prong of the test

for prosecutorial misconduct requires the Court to weigh four factors to determine whether the

-31-

improper conduct was "flagrant":

> (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong.

*Id*.  In short, the Court agrees with Magistrate Judge Perelman's analysis in the R&R.  First, as discussed above, the prosecutor prefaced his remarks regarding credibility as a response to defense counsel's attacks on the State's witnesses' credibility.  In addition, he concluded his remarks by reminding the jurors that it was up to them to determine the credibility of witnesses.  Consequently, the statement that T.D. "consistently told the truth" was not patently misleading or prejudicial. Second, as discussed in the R&R, the prosecutor's remarks vouching for T.D.'s credibility were not pervasive.  The Court agrees with Magistrate Judge Perelman that this case is distinguishable from *Hodge*, 426 F.3d 368, because the prosecutor's conduct in that case was far more pervasive and egregious.  With respect to the remaining factors, although the prosecutor's remarks were deliberate, the evidence against Scheck was strong.  Both T.D. and Samhan unequivocally testified that Scheck performed oral sex on T.D. by force and without her consent.  Scheck correctly notes that the sexual abuse case against Scheck turns on the witnesses' credibility, *see also Hodge*, 426 F.3d at 377 n.19, but the Court must consider the prosecutor's statements vouching for T.D.'s credibility in the context of the entire trial.  *Carter*, 236 F.3d at 783 (citing *Young*).  Taken as such, the prosecutor's conduct does not rise to the level of a "flagrant" violation.  *Id*.

Accordingly, Scheck's final ineffective assistance of appellate counsel claim fails at the outset.  He has not established that appellate counsel's failure to raise trial counsel's failure to object on the grounds of prosecutorial misconduct was objectively unreasonable.  The Court **ADOPTS, in**

**part**, the R&R with respect to Ground 1, Claim III of Scheck's Petition and this claim is **DISMISSED**.

### B.      GROUND 2: DESTRUCTION OF EVIDENCE IN VIOLATION OF DUE PROCESS

Ground 2 of Scheck's Petition asserts that the State violated his due process rights when, acting in bad faith, it ordered the destruction of the urine sample collected from T.D. two days after the rape.  The factual basis of this claim is described above in the discussion of Ground 1, Claim II.  The substantive legal basis of the claim is disputed – Scheck argues that this is a spoliation of evidence claim and cites *Arizona v. Youngblood*, 488 U.S. 51 (1988).  The State and Magistrate Judge Perelman analyze the claim under *Brady v. Maryland*, 373 U.S. 83 (1963).  Before turning to the merits of Ground 2, however, the Court must determine whether Scheck procedurally defaulted the claim by failing to object to the destruction of the urine sample at trial.

#### 1.      The R&R: Scheck Procedurally Defaulted Ground 2

Magistrate Judge Perelman recommends dismissing Ground 2 of Scheck's Petition as procedurally defaulted.  He reasons that Scheck did not object to the destruction of the urine sample at trial, and, accordingly, Ohio's contemporaneous objection requirement bars review of that issue on appeal.  He notes that the Ohio Appellate Court relied on the contemporaneous objection rule in dismissing this claim on direct appeal, and Scheck did not attempt to show cause and prejudice to overcome procedural default in his Petition.  (Doc. 8 at 20-23.)  Magistrate Judge Perelman thus concludes that, under the Sixth Circuit's four-part test for procedural default based on the failure to observe a state procedural rule, *see Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), procedural default bars Ground 2 of Scheck's Petition.  (Doc. 8 at 22-23.)

### 2.  Scheck's Objection Opposing Procedural Default

In his Objections, Scheck argues that Ground 2 is not procedurally defaulted because the Ohio Appellate Court "did not clearly rely on the contemporaneous objection rule in denying relief." (Doc. 9 at 12.)  He accurately cites Sixth Circuit law for the proposition that "procedural default does not bar consideration of a federal claim on habeas corpus review unless the last state court rendering a reasoned opinion on the case 'clearly and expressly states that its judgment rests on a state procedural bar.'" (*Id*. (citing *Patterson v. Haskins*, 316 F.3d 596, 604 (6th Cir. 2003) (quoting *Harris v. Reed*, 489 U.S. 255, 263 (1989)).)  Scheck also cites *Frazier v. Hoffman*, 343 F.3d 780, 799-800 (6th Cir. 2003) as supportive of his position.

### 3.  Analysis – Procedural Default Applies

As set forth above, the Sixth Circuit test for procedural default requires the Court to make the following four determinations:

> (1)  whether the petitioner failed to comply with an applicable state procedural rule;

> (2)  whether the state courts actually enforced the state procedural sanction;

> (3)  whether the state procedural bar is an "adequate and independent" state ground on which the state can foreclose federal review; and

> (4)  if the above are met, whether the petitioner has demonstrated "cause" and "prejudice."

*Maupin*, 785 F.2d at 138.  Scheck does not object to the R&R's conclusion that he failed to object to the destruction of the urine sample or that the contemporaneous objection rule is an "adequate and

independent" state grounds.[14]  Further, he makes no attempt to show "cause" and "prejudice." Scheck's only dispute relates to whether the Ohio Appellate Court actually relied on the contemporaneous objection rule in dismissing Scheck's claim.

Scheck first notes that the Ohio Appellate Court combined the analysis of his claim regarding prosecutorial misconduct based on the prosecutor's remarks during closing argument with its analysis of his claim regarding prosecutorial misconduct related to destruction of T.D.'s urine sample.  He concedes that the Ohio Appellate Court clearly relied on the contemporaneous rule in rejecting his argument that the prosecutor improperly referred to him as a "rapist" during the trial, but contends that it did not rely on procedural default in dismissing his prosecutorial misconduct claim concerning destruction of the urine sample.  He then asserts that, although the Ohio Appellate Court relied on the contemporaneous objection rule in dismissing his claim relating to closing arguments, it did <u>not</u> rely on a procedural bar in dismissing his destruction of evidence claim.  (Doc. 9 at 12.)  He quotes excerpts from the following section of Ohio Appellate Court's decision, set forth here in its entirety:

> As Appellant's second and sixth assignments of error are interrelated, this Court will address them together. In his second assignment of error, Appellant contends that the State committed prosecutorial misconduct when it authorized the destruction of crucial evidence prior to trial. In Appellant's sixth assignment of error, he contends that the State also committed prosecutorial misconduct when it referred to Appellant as a "rapist" during trial. We find no merit in these contentions.
>
> In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, an appellate court determines if the prosecutor's actions were improper, and, if so, whether the substantial rights of the defendant were actually prejudiced.

---

[14]  The Sixth Circuit recognizes that Ohio's contemporaneous objection rule is routinely enforced and sufficient to bar review of a claim dismissed on that ground by the state courts. *See*, *e.g.*, *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005).

*State v. Smith* (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883. The defendant must show that there is a reasonable probability that, but for the prosecutor's misconduct, the result of the proceeding would have been different. *State v. Loza* (1994), 71 Ohio St.3d 61, 78-79, 641 N.E.2d 1082.

Appellant has notably failed to identify the portion of the trial wherein the prosecutor referred to him as a "rapist." Nonetheless, a review of the transcript reveals that during closing argument the prosecutor stated:

> "You back down from a lie, like he did eight days before his trial. That's what a coward does, that's what a rapist does."

However, Appellant did not object to the prosecutor's alleged misconduct during his closing argument. As such, Appellant has waived a review except under the plain error standard regarding these comments. *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916; *State v. Smith*, 9th Dist. Nos. 01CA0039 and 01CA0055, 2002-Ohio-4402, at ¶ 103, citing *State v. Twyford* (2002), 94 Ohio St.3d 340, 763 N.E.2d 122. Furthermore, "[i]t is well-established that a prosecutor has wide latitude during closing argument to present his or her most convincing position based on the evidence presented at trial." *Smith, supra*, at ¶ 103, citing *State v. Phillips* (1995), 74 Ohio St.3d 72, 90, 656 N.E.2d 643. As Appellant has not asserted that the trial court committed plain error, we decline to address it.

In addition, although Appellant elicited testimony regarding the disposal of T.D.'s urine sample, the record reflects that he failed to raise an objection regarding the alleged prosecutorial misconduct. Even had Appellant objected to the disposal of this sample, he has failed to demonstrate that there is a reasonable probability that the outcome of the trial would have been different had he been able to test the urine sample. First and foremost, Appellant has failed to demonstrate that the prosecutor's actions amounted to misconduct. After all, the urine sample was taken forty-eight hours after the assault and thus, as Appellant's expert testified, the sample would not have revealed the amount of alcohol T.D. had consumed. In addition, during both the nurses' examination and at trial, T.D. readily admitted that she had ingested a mixture of cocaine and alcohol on the evening in question. In light of T.D.'s admission that she ingested cocaine and alcohol on July 27, 2004, we find that Appellant has failed to demonstrate (1) the relevance of the sample and (2) that he suffered any prejudice as a result of his inability to analyze the urine sample.

Appellant's second and sixth assignments of error are therefore overruled.

-36-

*State v. Scheck*, 2006-Ohio-647, 2006 WL 335636, *4-*5 (Ohio App. 9 Feb. 15, 2006).

The Court agrees with Magistrate Judge Perelman – the excerpt of the opinion quoted above, read in context, clearly and expressly states that the Ohio Appellate Court relied on the contemporaneous objection rule in dismissing Scheck's prosecutorial misconduct claim relating to destruction of the urine sample.  Unlike the cases Scheck cites, in which the state court did not even mention the procedural bar in analyzing the claim at issue, *see Patterson*, 316 F.3d at 605; *Frazier*, 343 F.3d at 791, 799-800, the Ohio Appellate Court expressly stated that Scheck failed to object and clearly relied on this procedural bar in dismissing this claim.  The fact that the court went on to consider the merits does not undermine this conclusion.  Indeed, the clause introducing the merits analysis – "Even had Appellant objected . . ." – clearly demonstrates that the first grounds for dismissal is procedural, and the merits analysis is an alternative grounds.

Scheck's argument under *Harris v. Reed*, 489 U.S. 255, 263 (1989), that this claim is not procedurally defaulted because the state court conducted an alternative merits analysis has been rejected by the Supreme Court and the Sixth Circuit.  In *Harris*, the Supreme Court specifically stated that state courts:

> Need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.  Thus, by applying the doctrine to habeas cases, *Sykes* curtails reconsideration of the federal issue on federal habeas as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision.  In this way, a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity.

489 U.S. at 264 n.10.[15]  Further, the Sixth Circuit has repeatedly noted that the existence of an

alternative merits analysis does not excuse procedural default when the state court clearly and

expressly relied on a procedural bar.  *See*, *e.g.*, *Scott v. Mitchell*, 209 F.3d 854, 865 (6th Cir. 2000)

("*Harris* does not preclude a finding that the state procedural rule was actually enforced where the

state court decision also relies on an alternative ground."); *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir.

1998) ("Coe claims that the court of appeals's alternative holding – the he would lose on the merits

anyway – means that he is not procedurally barred, because the state courts in fact reached the merits.

This argument fails due to the Supreme Court's decision in *Harris* . . . .").

Accordingly, the Court finds that Scheck procedurally defaulted his prosecutorial misconduct

claim relating to the destruction of the urine sample, and Ground 2 o f his Petition is **DISMISSED**.[16]

---

[15]  The *Harris v. Reed*, 489 U.S. 255, 263 (1989), rule requiring the state court to "clearly
and expressly" state that the judgment is based on a state procedural rule in order to foreclose
*habeas* review based on procedural default "only applies when a state court judgment rests
primarily on federal law or is interwoven with federal law."  *Simpson v. Jones*, 238 F.3d 399, 408
(6th Cir. 2000) (citing *Coe*, 161 F.3d at 329-30).  Here, to the extent it analyzed the merits of
Scheck's claims, the state court relied exclusively on Ohio law.

[16]  In the R&R, Magistrate Judge Perelman goes on to conclude that, even if Ground 2
were not procedurally defaulted, it fails on the merits.  The Court agrees with this conclusion,
albeit based on different reasoning.  The State and Magistrate Judge Perelman analyze this
prosecutorial misconduct claim as a failure to disclose exculpatory evidence under *Brady v.
Maryland*, 373 U.S. 83 (1963).  Scheck argues that it is a destruction of evidence claim under
*Arizona v. Youngblood*, 488 U.S. 51, 55-56 (1988).  The Court agrees with Scheck: the basis of
his claim is the State's <u>destruction</u> of the urine sample, not <u>suppression</u> of potentially exculpatory
evidence by the prosecution.   It is "a claim based on loss of evidence attributable to the
Government."  *Id*. at 57.  This distinction does not help Scheck, however, because he must
establish bad faith on the part of the State in order to prevail on his *Youngblood* claim.  *Id*. When
challenging "the failure of the State to preserve evidentiary material of which no more can be
said than that it could have been subjected to tests, the results of which might have exonerated
the defendant[,]" the defendant must show bad faith.  *Id*. at 57-58.  "We . . . hold that unless a
criminal defendant can show bad faith on the part of the police, failure to preserve potentially
useful evidence does not constitute a denial of due process of law."  *Id*. at 58.  Scheck argues that
the exculpatory nature of the sample was apparent and that it was a unique item of evidence that
should have been preserved.  He points to the fact that the State destroyed the urine sample *after*

-38-

## IV.    CONCLUSION REGARDING SCHECK'S § 2254 PETITION

For the foregoing reasons, although the Court rejects some of the reasoning in the R&R, it adopts Magistrate Judge Perelman's conclusion that Scheck is not entitled to *habeas* relief with respect to either of the  grounds in his Petition and it is **DISMISSED** accordingly.

## V.    SCHECK'S MOTION TO COMPEL (Doc. 11)

### A.    BACKGROUND

On March 13, 2009, Scheck filed his *Motion to Compel Court Order and Request for Emergency Restraining Order* requesting a Court order compelling the State to "cease-and-desist from tampering with and/or withholding petitioner's legal documents related to the habeas corpus petition before this Court."  (Doc. 11 at 2, Motion to Compel.)  The Motion to Compel challenges a policy at the Richland Correctional Institution ("RCI") in Mansfield, Ohio, where Scheck is housed.  Specifically, Scheck alleges that the Ohio Department of Rehabilitation and Corrections ("DRC") is interpreting and enforcing a policy, DRC Policy 59-LEG-01 ("the Policy") (Doc. 11-3), in a manner that unreasonably compromises his ability to obtain and retain legal materials relating to this case, in which he is acting *pro se*.  In pertinent part, the Policy provides as follows:

> VI.    PROCEDURES
>
> . . .
>
> E.    LEGAL MATERIALS

---

he retained a toxicology expert as evidence of bad faith.  Although this timing is *some* evidence of bad faith, the Ohio Appellate Court identified several good faith reasons the State chose not to preserve the evidence, and why its destruction did not prejudice Scheck.  *Scheck*, 2006 WL 335636 at *5.  Accordingly, though it certainly would have been a better prosecutorial practice to retain the urine sample or seek Scheck's consent to its destruction, even if Ground 2 of Scheck's petition was not subject to procedural default, the Court would not conclude that the state court merits analysis was an objectively unreasonable application of federal law.

-39-

1.   Inmates are permitted to possess a reasonable amount of general and personal legal materials.

2.   General and personal legal materials shall be maintained within the inmates's overall 2.4 cubic feet property limitation as provided in Administrative Rule 5120-9-33 and applicable institutional policies. General legal materials are subject to the general possession limits applicable to books, law books, stationery, or writing materials, etc. as provided in Administrative Rule 5120-9-33, DRC Policy 61-PRP-01, or applicable institutional rules and policies.

. . .

5.   If an inmate has personal legal material, which exceeds his/her capacity to store in the space allotted, the inmate may request that he/she be permitted to store the excess personal legal material in a secure location designated by the Warden for such purpose.

   a.   A staff person designated by the Warden shall review this request. A request for additional storage shall not be granted unless the volume of the inmate's personal legal material is greater than one half of the inmate's footlocker.

(Doc. 11-3 at 5-6.)

In general, each inmate is allowed to retain 2.4 cubic feet of personal property. According to Scheck, prior to March 4, 2009, RCI permitted him to keep all of his legal materials in a single box, the contents of which did not count against his 2.4 cubic feet, and allowed him to store it outside his footlocker and access the box and materials therein with twenty-four hour advance notice. Scheck states that RCI's interpretation and enforcement of the Policy changed on March 4, 2009. He contends that, since March 4, 2009:

Jenifer Risinger, Unit Manager, acting under the direct authority of Richard Hall, Warden . . . has taken control of petitioner's legal material, placed it in a locked location, and required a 30 day waiting period before any exchange of legal material can be made. Additionally, Unit Manager Risinger now requires any inmate taking possession of additional legal material from their legal box to include those materials in the inmates [sic] overall 2.4 pack-up, which requires an equal amount of personal property to be removed from that 2.4 pack-up. Those item[s] removed from the 2.4

-40-

> pack-up in exchange for taking possession of legal material then becomes "contraband" according to Unit Manager Risinger, and must be destroyed or sent home.

(Doc. 11 at 8.)  Scheck argues that Unit Manager Risinger's implementation of the Policy is forcing inmates, including him, "to chose [sic.] between personal items and legal material."  (*Id.*).

Scheck acknowledges that RCI has a legitimate penological interest in limiting inmates' storage of personal property, including legal materials.  He asserts, however, that the enforcement of the Policy with respect to this issue has been unreasonable since March 4, 2009 because it prevents inmates from accessing all necessary legal materials in a manner sufficient to allow preparation of complete and timely court filings.  He contends that, by comparison to the institution's approach prior to March 4, the austere interpretation of the Policy must be an effort to restrict access to legal materials, rather than limit the amount of personal property possessed due to routine storage concerns.  As evidence of this effort, Scheck notes that the new draconian interpretation of the Policy took effect *after* another inmate at RCI filed a motion for a temporary restraining order on March 2, 2009 seeking access to his legal materials.  Scheck argues that one can infer that the new interpretation is in retaliation for the other inmate's legal action against RCI.  (Doc. 11 at 9-10.)

Scheck requests specific relief, the gist of which is that the Court should order RCI to return to its earlier interpretation and enforcement of the Policy and should monitor the institution's adherence to this approach.  (Doc. 11 at 11.)

The State responded to Scheck's Motion to Compel on March 16, 2009.  (Doc. 12.)  First, the State argues that the motion is a challenge to Scheck's conditions of confinement that is not within the scope of this *habeas* proceeding.  Second, the State notes that, even if his motion were appropriate, it is not well-taken under the general legal standard for a temporary restraining order

-41-

or preliminary injunction.  The State contends that Scheck cannot establish irreparable harm because (1) he still has access to his legal materials even under the post-March 4 interpretation and enforcement of the Policy and (2) he is not seeking and does not need immediate access to his legal materials because his Petition is fully briefed and pending resolution by this Court.  Third, the State argues that Scheck has failed to exhaust his administrative remedies by bringing his challenge through the institutional procedures available to him.

In his Reply, Scheck clarifies that he is not challenging the Policy, but merely seeking relief from this Court to "preserve the integrity of this case" pursuant to the Court's inherent power "to control the progress of the cause so as to maintain the orderly process of justice."  (Doc. 13 at 2 (quoting *Enelow v. New York Life Ins. Co.*, 293 U.S. 379, 382 (1935).)  As a result, he argues, exhaustion of administrative remedies is not a prerequisite to this motion.

He also argues that the injunctive relief he seeks is appropriate under the circumstances.  He notes that, although there is presently no need to prepare any filings in this case, the moment the Court issues its opinion he will likely need access to his legal materials for purposes of appeal.  He states that he

> would simply like to avoid the State 'stacking the deck' even more in their favor by limiting petitioner's ability to prepare for whatever litigation may be imminent.  This cannot be accomplished by allowing petitioner to take some of his legal material, wait 30 days, and exchange that material for another portion.  Stated differently, there may be times when such arrangements are sufficient.  However, there may be times where such arrangements are detrimental.  The State should not be given that additional control without some showing of a legitimate penological interest.

(Doc. 13 at 6.)  He notes that courts have long-held that withholding inmates' legal papers burdens a constitutional right and must be reasonably related to a legitimate penological interest.  (*Id.* at 7.)

**B.     ANALYSIS**

At the outset, the Court finds Scheck's description of the interpretation of the Policy troubling, and notes that the State does not deny that the description is accurate.  The most problematic aspect of the Policy as it is currently enforced is that an inmate may have to wait thirty (30) days to gain access to legal materials necessary to his or her case.

The Court finds, however, that Scheck cannot satisfy the standard applicable to this situation, *i.e.*, the *Bounds* doctrine ensuring inmates' right of reasonable access to the courts.  *See Bounds v. Smith*, 430 U.S. 817 (1977).  In *Bounds*, the Supreme Court held that "[i]t is now established beyond doubt that prisoners have a constitutional right of access to the courts." *Id*. at 821.  Further, the State must "insure that inmate access to the courts is adequate, effective, and meaningful." *Id*. at 822.  In *Lewis v. Casey*, 518 U.S. 343, 351-52 (1996), however, the Supreme Court clarified that a prisoner asserting a constitutional claim for denial of access to the courts under *Bounds* must demonstrate an actual injury.  *See also Harbin-Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*) (noting that the actual injury requirement derives from the constitutional standing principle)).  "Examples of actual prejudice to pending or contemplated litigation include having a case dismissed, being unable to file a complaint, and missing a court-imposed deadline." *Harbin-Bey*, 420 F.3d at 578.

Scheck has not alleged an actual injury.  Theoretically, the scenario he describes in which the thirty (30) day waiting period prevents him from meeting a filing deadline is distinctly possible based on the current interpretation and enforcement of the Policy.  To date, however, the Policy has not caused Scheck to miss a deadline or have his case dismissed, nor has it impeded his ability to file anything.  Consequently, he cannot prevail on a denial of access to the courts claim.  Therefore, even

assuming he is correct with respect to his argument that his Motion to Compel Order falls within the Court's inherent power to supervise this case, he fails to satisfy the factors necessary to establish a right to injunctive relief under the standard he correctly articulates for a temporary restraining order or preliminary injunction.  Scheck's Motion to Compel Order is **DENIED** accordingly.

The Court again notes, however, that, if the policy is being interpreted and enforced as Scheck describes, it is likely that an inmate would suffer actual injury as a result, ripening a valid constitutional claim for denial of access to the Court period.  Accordingly, the Court urges RCI to review the subject policy and address this potential.

* * *

## CONCLUSION

For the foregoing reasons, Petitioner Michael Scheck's *Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus* (Doc. 1) is hereby **DISMISSED** and his *Motion to Compel Court Order and Request for Emergency Restraining Order* (Doc. 11) is **DENIED**.


**IT IS SO ORDERED.**

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: August 11, 2009**

-44-